QUINN EMANUEL URQUHART & SULLIVAN, LLP
Steven M. Edwards (Bar No. 2773 )
stevenedwards@quinnemanuel.com
51 Madison Ave, 22nd Fl.
New York, NY 10010
Telephone:     (212)849-7262
Facsimile:     (212)849-7100

*Attorneys for Plaintiff Caruso Management Company Ltd.*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARUSO MANAGEMENT COMPANY LTD., a California limited partnership with its principal place of business in Los Angeles, California,<br><br>        Plaintiff,<br><br><br>                vs.<br><br><br> INTERNATIONAL COUNCIL OF SHOPPING CENTERS, an Illinois not-for-profit corporation with its principal place of business in New York, New York,<br><br><br>        Defendant. | No.  __ -cv- ____ (  ) (  )<br><br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

Plaintiff Caruso Management Company Ltd. ("Caruso") for its Complaint against

International Council of Shopping Centers ("ICSC"), avers as follows:

## NATURE OF THE ACTION

1.      ICSC is a trade association with over 70,000 members who engage in the shopping center business.  It is the world's largest trade association for firms and individuals involved in the shopping center business.  Caruso, for itself and through its affiliated entities, is in the business of acquiring, owning, operating, developing, and leasing real estate, including shopping centers. Caruso, and most of Caruso's major competitors, belong to ICSC.

2.      Every year, ICSC holds its annual convention, known as RECon, in Las Vegas, Nevada, at the Las Vegas Convention Center.  According to ICSC, RECon is the largest  gathering of real estate professionals in the world, with more than 35,000 attendees, most of whom are involved in the shopping center business.   The attendees of RECon include most of Caruso's customers,[1] as well as its major competitors.

3.      For 16 of the past 18 years, Caruso has paid for and set up a booth at the RECon convention for the purpose of connecting with customers and others with whom it does business, including lenders and other potential transactional counterparties.   In recent years, however, Caruso has found that setting up a booth at RECon has become ineffective, in part because some of the major mall companies – who are Caruso's competitors -- have set up locations to meet with potential customers offsite, and as a result many customers prefer to meet offsite.  These meetings are very important to Caruso because they often lead to contracts with customers to rent space in shopping centers or other business transactions.

---

[1]   As used herein, the word "customers" refers to actual and potential tenants of Caruso's properties, as well as other transactional counterparties.

4.      In 2018, even though it paid to lease space at RECon, Caruso decided to rent space at the Encore at Wynn Las Vegas, one of the hotels that comprise the Wynn Resorts in Las Vegas (the "Wynn"), a resort with nearly 4,000 rooms, 29 restaurants and numerous meeting places and bars.  Caruso chose to rent space at the Wynn because many of its customers and other real estate professionals in Las Vegas for RECon stay at the Wynn, the Wynn is consistent with Caruso's brand, and the Wynn is close to the convention center.

5.      On April 11, 2018, Caruso entered into a contract with the Wynn to use the Encore Players' Lounge to conduct meetings with customers on May 21, 2018, during RECon 2018, which ran from May 20 to May 23, 2018.  On May 18, 2018 – just three days before the meetings were scheduled to take place  – a senior executive of the Wynn informed Caruso that ICSC had threatened to cancel its contract with the Wynn as a host hotel for RECon  and pull RECon from Las Vegas altogether if the Wynn permitted Caruso to use the Encore Players' Lounge as contemplated.

6.      The 2018 episode was ultimately resolved when Caruso and the Wynn agreed to move the  meetings Caruso had scheduled from the originally planned location at the Players' Lounge to the Sinatra restaurant at the Encore.  When Caruso attempted to book the Sinatra restaurant for its meetings during the 2019 RECon convention, however, a Wynn executive informed Caruso that Caruso would not be allowed to conduct meetings at the Sinatra restaurant or at any other public space at the Wynn.  The Wynn executive suggested that Caruso could rent and hold its meetings in a private suite within the "Tower Suites" building of the Wynn, but this alternative was inferior  because the suites are far less accessible than the more public areas of the Encore such as the Sinatra restaurant.    That Wynn executive also told Caruso that the Wynn was willing to rent the Sinatra restaurant to Caruso, but ICSC had pressured it not to do so.  In addition,

that Wynn executive  told Caruso that ICSC was going to put pressure on other hotels to prohibit offsite meetings during the RECon convention.

7.     ICSC's conduct is a per se violation of the antitrust laws.   ICSC is a trade association that includes separate economic actors who pursue their separate economic interests even when they act through the trade association.  As such, conduct by ICSC that unreasonably restrains trade is a horizontal combination or conspiracy that is condemned under Section 1 of the Sherman Act, 15 U.S.C. § 1, without regard to whether ICSC has market power or asserts justifications for its conduct.  A group of horizontal competitors cannot act in concert to coerce a third party, in this case the Wynn, not to deal with another competitor.

8.     ICSC's conduct also violates the rule of reason under federal antitrust laws.   As the largest trade association for companies engaged in the shopping center business, with a market share of more than 90%, ICSC has significant market power, as evidenced by its ability to coerce the Wynn into refusing to rent meeting space to Caruso, even though Wynn had confirmed its interest in doing so, and it would have been profitable to the Wynn to do so.  ICSC's conduct in coercing the Wynn to refuse to rent meeting space to Caruso has anticompetitive effects because it deprives Caruso of the ability to choose the time and place where it will compete.  ICSC's asserted justification for its conduct – that it is designed to prevent free riding – is nothing more than an admission that it is attempting to dictate the time and place of competition, and in any event, any procompetitive justifications for ICSC's conduct are outweighed by the anticompetitive effects.

9.     ICSC's conduct also constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  ICSC's market power is so significant as to constitute monopoly power.  Its conduct in coercing the Wynn to boycott Caruso and restrict the time and place in which

Caruso may compete is predatory conduct that is designed to maintain ICSC's monopoly power. Monopoly power plus predatory conduct constitutes monopolization.

10.     ICSC's conduct also constitutes tortious interference with a contract in 2018 and tortious interference with prospective business advantage in 2019.  ICSC knew that Caruso had contracted to rent space at the Players' Lounge in 2018 before it pressured the Wynn to deny Caruso the meeting space for which it had contracted.  ICSC then again engaged in improper conduct by pressuring the Wynn to deny Caruso any public meeting space in 2019.

11.     As one of the smaller firms in the business of developing, owning, operating and leasing space in shopping centers, Caruso is always looking for ways to compete with its larger competitors.  Caruso found that it was more successful in 2018 when it held meetings at the Sinatra restaurant than in previous years when it held similar meetings at its booth within the convention center.  By holding meetings at the location of its choice, Caruso is able to create an environment more conducive to conducting business and one that its customers prefer.  By depriving Caruso of the ability to do that, ICSC causes competitive harm to Caruso because many of the customers with whom it would like to meet will not come to the convention center.  That harm cannot be adequately compensated by money damages.   Caruso is entitled to preliminary and permanent injunctive relief to prevent that harm.

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, as well as injunctive relief against ICSC as a result of its violations of the antitrust laws.

13.     This Court has subject matter jurisdiction over Caruso's antitrust claims pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as 28 U.S.C. §§ 1331 and 1337(a).

14.     This Court has supplemental jurisdiction over Caruso's common law claims pursuant to 28 U.S.C. § 1367, and diversity jurisdiction over those claims pursuant to 28 U.S.C. § 1332 because ICSC is a citizen of Illinois, where it is incorporated, and New York, which is its principal place of business, and Caruso is a citizen of California, which is its principal place of business, and the amount in controversy exceeds $75,000.

15.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as pursuant to 28 U.S.C. § 1391 (b), (c) and (d) because Defendant ICSC resides in New York City, a substantial part of the events giving rise to the claim occurred in the District, and a substantial part of the affected interstate trade and commerce discussed herein was carried out in this District.

16.     Defendant ICSC's activities were within the flow of, were intended to, and had a substantial effect on, interstate commerce because Plaintiff Caruso conducts business all over the country.

17.     Defendant ICSC is subject to personal jurisdiction in this District because its principal place of business is 1221 Avenue of the Americas, 41st Floor, New York, New York 10020-1099.

**THE PARTIES**

18.     Plaintiff Caruso is a California limited partnership located at 101 The Grove Drive, Los Angeles, California, 90036.  Founded in 1991, Caruso for itself and through its affiliated entities is in the business of acquiring, owning, operating, developing, and leasing real estate, including shopping centers, among other things.  It owns and manages properties located in

California.    Caruso has been a member of Defendant ICSC since approximately 1996.  Rick Caruso served on the board of trustees of ICSC for a number of years but was asked to step down when he gave a speech suggesting that the traditional shopping mall is "dead."

19.    Defendant ICSC is an Illinois not-for-profit corporation with its principal place of business in New York County in the City and State of New York.  Founded in 1957, ICSC claims to be the largest trade association for businesses and individuals involved in the shopping center business, with more than 70,000 members in over 100 countries.  It purports to work to advance the retail industry through various means, including providing educational programs and holding meetings and conferences.

20.    ICSC has an antitrust policy which states:  "As a trade association, ICSC is subject to strict scrutiny under federal and state antitrust laws. . . . [B]ecause ICSC members and event participants may constitute competitors in the real estate industry, great care must be taken to ensure that ICSC activities are conducted consistently with antitrust laws. . . . ICSC may not play any role in the competitive decisions of its members or their employers, or in any way restrict competition in the retail real estate industry.  The purpose of this policy is to prevent ICSC from being misused as a vehicle for anti-competitive agreements regarding prices, *boycotts, exclusion of players from the market*, or other unlawful activities."  (Emphasis added.)  "Accordingly, in connection with any ICSC event or activity, discussion of the following subjects is prohibited . . . *Boycotts*, exclusions, *refusals to deal* with suppliers, customers, competitors or *other third parties* (or any class or type of suppliers, customers or other third parties) . . . ."  (Emphasis added.)

21.    ICSC violated its own policy by engaging in activities that violate the antitrust laws, including using its financial clout in an effort to: (a) force Caruso to abandon its competitive decision to conduct offsite meetings with customers; (b) restrict Caruso's meetings with customers

7

to the convention center; (c) threaten to boycott the Wynn if it rents meeting space to Caruso; and (d) force the Wynn to exclude Caruso from Caruso's preferred meeting spaces at the Wynn. ICSC's own antitrust policies are violated by the mere discussion of these topics, and ICSC's clear, affirmative acts in furtherance of these efforts constitute a plain violation of the antitrust laws. Because ICSC's conduct violated ICSC's own policies, the conduct must be viewed as intentional.

## STATEMENT OF FACTS

### A.  The RECon Convention

22.     According to ICSC's website, the RECon convention is the largest annual gathering of real estate professionals in the world.  The purpose of RECon is networking, deal making and professional development.  According to ICSC promotional materials, RECon provides an opportunity for ICSC members to revitalize their networks; meet with top level industry players; gain insight into the future; connect with colleagues from leasing, marketing, retail, management, research, construction and design as well as investors, lenders, brokers, developers and many others; experience technology that is transforming the industry; and take part in open and authentic conversation about the state of diversity in retail real estate and overcoming the obstacles vital to the industry's success.

23.     Participants who wish to lease space from ICSC may do so.  The cost varies based on size and is approximately $26,000 for the 2,400 square feet Caruso typically leases.  The space may be used to set up booths and exhibits and to meet with customers and other participants in the shopping center industry.  Caruso has typically leased space and set up a booth each year since 2000.

24.     In 2018, Caruso paid for convention space but did not use it, and it has decided to do the same thing in 2019.  Caruso made that decision in part because for a number of years, major

mall owners such as Simon, GGP/Brookfield, Macerich, Westfield and Taubman have moved their meetings with existing and prospective tenants outside the convention center.  As a result, many of the existing or prospective customers with whom Caruso sought to meet were spending only limited time at the convention center (if any), and Caruso concluded that limiting its meetings to the convention center would be an impediment to securing the meetings it sought.   Caruso concluded that its business prospects were best served by securing an offsite location –a publicly visible and easily accessible location at the Wynn – at which to conduct its meetings.

25.     Caruso estimates that approximately 95% percent of the ICSC exhibitors have decided to stay at the convention center, presumably because doing so fits their business models. Caruso has decided to conduct meetings offsite because many of its customers are the same or similar to the key customers of the major malls, and Caruso is better able to secure the meetings that it seeks by holding them in an offsite location.  Put simply, Caruso has concluded that its business interests are best served, and its use of resources to conduct meetings in Las Vegas are optimized, by creating a meeting location at the Wynn and not at the convention center.  Restricting Caruso's ability to hold such meetings offsite is likely to have a negative effect on its business.

26.     As noted above and for these reasons, for the 2018 RECon Caruso chose to schedule offsite meetings at the Wynn.  It chose the Wynn because many of the customers and others with whom Caruso wanted to meet with stay there and because the Wynn is viewed as a high quality hotel that Caruso believes is consistent with its brand.  Furthermore, the Caruso team has been staying at the Wynn for many years..

27.     Because many of the people with whom Caruso wants to meet tend to stay or congregate at the Wynn, and Caruso has concluded that the high-end Encore and overall Wynn Resort are more consistent with the Caruso brand, it would not make sense to choose a different

hotel at which to conduct its meetings.  The major hotels in Las Vegas are very spread out, so it is not practical to expect customers to walk or drive from one hotel to another just to meet with Caruso.  The Wynn is the best choice for what Caruso seeks to accomplish.

28.     While the Wynn has told Caruso that Caruso cannot hold meetings at the Sinatra restaurant at Encore because doing so will cause ICSC to revoke Wynn's status as the host hotel for the RECon convention, there is nothing on the ICSC website that identifies the Wynn as "the" host hotel.  Rather, the ICSC RECon website include links to 37 hotels, including the Wynn.  Many of the other hotels have ICSC-related meetings and parties, and there are typically many meetings and parties at the Wynn.  The only official event at the Wynn listed on the ICSC website for the 2019 RECon is an opening reception at the Encore XS Nightclub from 7:30 p.m. to 9:30 p.m. on Sunday, May 19, 2019.  This is a day before Caruso plans to conduct its offsite meetings, which Caruso hopes to hold at the Sinatra restaurant from approximately 9:00 a.m. to 6:00 p.m. on Monday, May 20, 2019.

**B.  The Events Leading Up To This Dispute**

29.     On April 11, 2018, Caruso entered into a contract with the Wynn to rent space at the Encore Players' Lounge within the Wynn.  Caruso paid a deposit of $10,000 and began to invite people to the space.  The meetings were to occur on May 21, 2018.

30.     In early May, 2018, Bret Nielsen of Caruso informed Michael Belli, Business Development Manager for ICSC, that Caruso planned to conduct meetings offsite because  most of the customers with whom Caruso planned to meet were either not registered for the convention center or were registered but not planning to schedule meetings at the convention center.  Some of Caruso's customers had informed Caruso that they would not be present at the convention center because they had meetings with some of the major shopping center owners and these major

shopping center owners were conducting meetings offsite.  Mr. Nielsen explained that, as a result, Caruso would not be exhibiting at the convention center but would nevertheless be paying for its space.  Mr. Belli said he understood and did not object at the time.

31.     On May 18, 2018, Mr. Nielsen received a message to call Steve Weitman, COO of the Wynn.  Mr. Weitman told Mr. Nielsen that ICSC  had put pressure on the Wynn not to permit Caruso to hold meetings at the Encore Players' Lounge.  Mr. Weitman added that if the Wynn did not accede to ICSC's demand, ICSC had threatened to cancel its contract with the Wynn in relation with RECon.  Mr. Weitman also told Mr. Nielsen that ICSC was threatening to pull the entire RECon convention out of Las Vegas if the Wynn allowed Caruso's meetings to proceed as planned.

32.     That same day, Mr. Nielsen called Mr. Belli to ask if he knew what was going on, and Mr. Belli stated that he had heard that Malachy Kavanagh, Senior Vice President for Programs and Services of ICSC, had instructed the Wynn not to permit Caruso to hold meetings at the Wynn.  Caruso's General Counsel, Ben Howell, then sent an email to ICSC's President and CEO, Tom McGee, accusing ICSC of interfering with Caruso's business.   Ultimately, Caruso agreed with Wynn to relocate its planned meetings from the Players' Lounge to the Sinatra restaurant.

33.     On May 21, 2018, Caruso held a series of successful business meetings at the Sinatra restaurant.  The next day, on May 22, 2018, after the meetings were over, Mr. Nielsen informed Antoinette Bruce, Director of Restaurant Events at the Wynn, that Caruso would like to reserve the Sinatra restaurant to conduct meetings during RECon 2019.   On August 13, 2018, Jeremy Powers of the Wynn informed Mr. Nielsen that Tim McGinnis, ICSC's Vice President for Global Trade Expositions, had pressured the Wynn not to allow Caruso to conduct meetings at the Sinatra restaurant or anywhere else at the Wynn Las Vegas or the Encore during RECon 2019.

Mr. Weitman of the Wynn later confirmed that ICSC would not allow the Wynn to permit Caruso to conduct meetings at any publicly accessible or visible location at the Wynn, and if the Wynn did so, ICSC would terminate its relationship with the Wynn.

34.     At no time during these discussions did either the Wynn or ICSC claim that ICSC had an exclusive contract with the Wynn that would prevent the Wynn from renting meeting space to Caruso.  Plaintiff's counsel requested a copy of ICSC's contract with the Wynn for 2018, but ICSC refused to provide it.  Even if such an exclusive contract exists, it is unlawful for the reasons described below.

**C.  ICSC's Free Rider Defense Is A Sham**

35.     At various times ICSC has suggested that its efforts to prevent Caruso from conducting meetings at the Wynn are justified because they are designed to prevent "free riding." That excuse is a sham.  ICSC's conduct is nothing more than a naked restraint of trade.

36.     Free riding occurs when those who benefit from resources, goods or services do not pay for them.  Here there can be no doubt that Caruso pays its fair share for any promotional benefits ICSC provides.  In fact it pays more than its fair share.  In 2018, in addition to paying its dues and all charges for the convention, it paid  the exhibitor's fee for convention space even though it did not use the space, and, upon information and belief, ICSC resold the space, so it collected twice.

37.     Other conference attendees are free to hold parties and offsite meetings, including offsite meetings at the Wynn.  Persons and firms that do not pay any fees often hold offsite meetings at the Wynn during RECon, including real estate brokers, tenant representatives and smaller-sized real estate developers, owners, and operators. Caruso does not hold offsite meetings

at the Wynn at the same time that ICSC is holding promotional events there such as ICSC's welcome reception, which occurs the night before Caruso's meetings begin.

38.     What ICSC is really concerned about is not free riding; it is concerned that Caruso is holding offsite meetings with customers at a time when ICSC would prefer that Caruso meet with customers at the convention center.  The time and place of meetings with customers is one of the most important "competitive decisions" that a firm makes in deciding how to compete in the marketplace.  By interfering with that choice, ICSC has violated the antitrust laws and its own antitrust guidelines. Pressuring a third party, in this case the Wynn, to deny Caruso that choice, is a naked restraint of trade.  ICSC's rationale for its so-called exclusive contract is nothing more than an admission of guilt.

### D.  ICSC Has Significant Market Power

39.     There are three product markets that are relevant to this case:  (a) the market for shopping center trade associations; (b) the market for meeting with customers during RECon; and (c) the market for holding offsite meetings with customers at the Wynn.

40.     Trade associations for businesses and individuals involved in the shopping center business is a relevant product market because such trade associations provide a unique opportunity for owners and managers to meet with customers.  Many important contacts are made, and transactions initiated, at trade association meetings.   Trade associations for businesses and individuals involved in the shopping center business are not interchangeable with other trade associations.  Using the "hypothetical monopolist" test of the Justice Department's Merger Guidelines, a hypothetical monopolist of  trade associations for businesses and individuals involved in the shopping center business would be able to impose a small but significant and non-

transitory increase in price (hereinafter referred to as the "SSNIP test") on membership fees and other charges, or discounts on the prices paid to  hotels.[2]

41.     The  relevant  geographic  market  for  trade  associations  for  businesses  and individuals involved in the shopping center business is nationwide because that is the area of effective  competition  for  such  trade  associations.   Furthermore, applying  the  SSNIP  test,  a hypothetical  monopolist  of  trade  associations  for  businesses  and  individuals  involved  in  the shopping  center  business  would  not  lose  a  meaningful  amount  of  business  to  such  trade associations outside the United States.

42.     The  market for meeting  with customers at RECon is a relevant product market because  RECon  provides  a  unique  opportunity  to  meet  with  such  customers.   There  is  no reasonably interchangeable substitute for RECon in terms of opportunities to meet with customers during  the  quarter  in  which  RECon  takes  place  because  RECon  is  the  largest  gathering  of  real estate professionals in the world, with more than 35,000 attendees, and Caruso estimates that no more than 25% of those meetings occur offsite.  Applying the hypothetical monopolist test, ICSC has been able to achieve a SSNIP because of the high prices it charges attendees and the discounts it has been able to extract from hotels in connection with the convention.

43.     The  relevant  geographic  market   for  meeting  with  customers  at  RECon  is  Las Vegas.  That would be the area of effective competition if another trade association attempted to compete with ICSC's RECon.  Furthermore, applying the hypothetical monopolist test, ICSC has been able to achieve a SSNIP without losing business to conventions outside of Las Vegas.

44.     The  Wynn is also a relevant product market because, from Caruso's standpoint, it is  not  reasonably  interchangeable  with  other  hotels.   The  Wynn  has  unique  characteristics

---

[2]   As used herein, the term "SSNIP test" refers to both increases in price and discounts.

including its brand recognition, its massive number of rooms, and its proximity to the Las Vegas Convention Center.  Applying the hypothetical monopolist test, the Wynn has been able to pass the SSNIP test because , in effect, Caruso ended up paying  twice for space to meet with customers – Sinatra and the space at RECon.

45.     The Wynn is also a relevant geographic market because, from Caruso's standpoint, it would not make sense to conduct offsite meetings at another hotel.  Many of the customers Caruso wants to meet with congregate at the Wynn, and given how far apart major hotels are from each other, it would not make sense to expect a customer to walk or drive from the Wynn to another hotel.  Furthermore, on information and belief, ICSC has also been pressuring other hotels not to permit offsite meetings during RECon.

46.     ICSC's market power in each of the three markets is demonstrated by its ability to extract significant concessions from the Wynn, including a decision by the Wynn not to rent meeting space to Caruso even though that activity would be profitable to the Wynn.  Furthermore, ICSC's market power in each of the relevant markets is demonstrated by its market share:  (a) over 90% of the market for shopping center trade associations; (b) approximately 75% of the market for meetings with customers  during RECon; and (c) 100% of the market for holding offsite meetings with customers at the Wynn, since ICSC takes the position that this cannot occur without the permission of ICSC.

47.     There are significant barriers to entry into the market for trade associations for businesses and individuals involved in the shopping center business as demonstrated by ICSC's ability to maintain its market shares for more than ten years.  Creating a trade association with more than 70,000 members requires more than 400 employees and the creation of many departments including communications, marketing, publications, research, membership, public

policy, programs, services and international offices. It also requires attracting members, developing membership lists and providing a method of communicating with members, including a computer network dedicated to that task. In addition, it requires development and ability to put on large conventions, such as RECon, with more than 35,000 attendees.

## COUNT I
### (Per se Violation of the Antitrust Laws)

48. The averments of paragraphs 1 through 47 are repeated and realleged as if fully set forth herein.

49. As a trade association, ICSC's conduct is considered to be the conduct of its individual members, except for certain ministerial acts not relevant here. Horizontal competitors cannot shield their conduct by carrying it out through the means of a trade association. Even though they have formed a trade association, by maintaining their identity as separate economic actors with separate economic interests, the members are responsible for the conduct of the trade association that is carried out for their benefit, and that conduct is treated as if the individual members conspired to engage in that conduct without using the trade association as their agent. The membership of Caruso's competitors in ICSC is sufficient to establish an agreement that constitutes a combination or conspiracy in restraint of trade.

50. The conduct of ICSC as described herein constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 15. By using the collective power of its members, many of whom are Caruso's competitors, to threaten to boycott the Wynn if it permitted Caruso to hold off-site meetings during RECon, ICSC has engaged in a group boycott. By using the collective power of its members, many of whom are Caruso's competitors, to dictate and restrict the circumstances under which Caruso may compete, ICSC has engaged in an agreement to restrict output.

51.     Group boycotts and restrictions on output are generally considered to be agreements that are so plainly and manifestly anticompetitive that they may be condemned without elaborate inquiry into the harm they have caused or the business excuse for their use.  Nor is it necessary to define a market or establish market power to establish a per se violation of the antitrust laws. Condemnation of certain agreements – such as group boycotts and agreements to restrict output – as per se violations is deemed necessary to discourage their use.

52.     To the extent that ICSC contends that its conduct is justified because it has an exclusive contract with the Wynn, that contention has no merit.  An exclusive contract that purports to achieve the same effect as a group boycott is a group boycott.  If there is in fact an explicit agreement that establishes ICSC's purpose and intent, that only makes the per se violation easier to prove.

53.     The conduct complained of herein is the type of conduct that the antitrust laws were designed to prohibit; it has affected interstate commerce; and it has caused or threatens to cause direct injury to Caruso's business or property.  Caruso is an "efficient enforcer" of this claim because (a) there is a direct causal effect between the antitrust violation and the harm to Caruso, and the harm was intended; (b) Caruso is a direct competitor of certain members of ICSC that the anticompetitive conduct was designed to benefit; (c) the injury to Caruso is direct, and while damages may be difficult to quantify in certain instances, the fact of damages is not speculative; (d) there is no risk of duplicative recovery; and (e) there are no more direct victims.

54.     The conduct complained of herein has damaged Caruso and threatens to damage Caruso in the future in an amount that will be determined at trial. Because it will be difficult to identify all of the customer relationships that ICSC's conduct has jeopardized and determine

whether they would have led to a deal, Caruso has suffered and will suffer irreparable harm in the future and is entitled to preliminary and permanent injunctive relief.

## COUNT II
### (Violation of the Rule of Reason)

55.     The averments of paragraphs 1 through 54 are repeated and realleged as if fully set forth herein.

56.     In addition and as an alternative to constituting a per se violation of the antitrust laws, ICSC's conduct violates the rule of reason, which is also prohibited under Section 1 of the Sherman Act, 15 U.S. C. § 1.  The elements of a rule of reason violation are (a) significant market power in the relevant market; (b) harm to competition from the conduct in question; and (c) any pro-competitive justifications are outweighed by the anticompetitive effects.

57.     ICSC has significant market power in the relevant markets as demonstrated by its market shares of the three relevant markets alleged herein:    (a) the market for shopping center trade associations; (b) the market for meeting with customers during RECon; and (c) the market for holding offsite meetings with customers at the Wynn.  ICSC's market power is also demonstrated by its ability to extract certain concessions from the Wynn, including an agreement not to rent off-site meeting space to Caruso even though it would be profitable to the Wynn to do so.  ICSC's market power is enhanced by the barriers to entry described above.

58.     The group boycott  and the restriction on output that ICSC have imposed has harmed competition.  That is particularly so since, as alleged above on information and belief, ICSC is engaging in similar conduct with respect to other entities that hold offsite meetings at other hotels.  ICSC's conduct has harmed competition by controlling the time and place in which competitors can compete.

59.     There are no procompetitive justifications for ICSC's conduct.  As demonstrated above, ICSC's free rider argument is a sham.  The very purpose and effect of ICSC's free rider argument demonstrates why ICSC's conduct harms competition.

60.     Even if there were some pro-competitive justification for ICSC's conduct, that justification is outweighed by the anticompetitive effects.   As discussed above, there are so many exceptions to ICSC's "no offsite meetings" rule, it is completely useless.  There are many offsite meetings that occur at the Wynn and many such meetings that occur at other hotels that have the same effect as Caruso's offsite meetings.  Furthermore, Caruso's offsite meetings do not occur at the same time in which ICSC-sponsored meetings are occurring at the Wynn.

61.     Viewed from a rule of reason standpoint, the conduct complained of herein is the type of conduct that the antitrust laws were designed to prohibit; it has affected interstate commerce; and it has caused or threatens to cause direct injury to Caruso's business or property. Caruso is an "efficient enforcer" of this claim because (a) there is a direct causal effect between the antitrust violation and the harm to Caruso, and the harm was intended; (b) Caruso is a direct competitor of certain members of ICSC that the anticompetitive conduct was designed to benefit; (c) the injury to Caruso is direct, and while damages may be difficult to quantify in certain instances, the fact of damages is not speculative; (d) there is no risk of duplicative recovery; and (e) there are no more direct victims.

62.     The conduct complained of herein has damaged Caruso and threatens to damage Caruso in the future in an amount that will be determined at trial. Because it will be difficult to identify all of the customer relationships that ICSC's conduct has jeopardized and determine whether they would have led to a deal, Caruso has suffered and will suffer irreparable harm in the future and is entitled to preliminary and permanent injunctive relief.

## COUNT III

### (Maintenance and Abuse of Monopoly Power In Violation of Section 2 of the Sherman Act)

63.     The averments of paragraphs 1 through 62 are repeated and realleged  as if fully set forth herein.

64.     In addition and as an alternative to constituting a violation of Section 1 of the Sherman Act, ICSC's conduct constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.   In discussions between the parties, ICSC has suggested that its conduct is that of a single actor and therefore cannot violate Section 1 of the Sherman Act.  As discussed above, that is incorrect; but even if ICSC's conduct were deemed to be unilateral conduct, it would violate Section 2 of the Sherman Act.

65.     ICSC's market power in the relevant markets is so significant it constitutes monopoly power.  As alleged above, ICSC has market shares of over 90% of the market for shopping center trade associations;  75% of the market for meeting with customers during RECon; and 100% of the market for holding offsite meetings with customers at the Wynn.  Together with the barriers to entry, discussed above, these market shares give ICSC the ability to raise prices (in this case lower prices by extracting discounts from hotels) and exclude competition (in this case prevent Caruso from conducting offsite meetings at the Wynn), which is the test for monopoly power.  Furthermore, it is clear that ICSC's conduct is designed to maintain its 75% share of the market for meetings with customers at RECon and increase it to 100% if possible.

66.     ICSC's conduct in promoting boycotts and restricting the time and place in which competitors can compete constitutes predatory conduct.  Monopoly power plus predatory conduct constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 16.

67.     Viewed from a monopolization standpoint, the conduct complained of herein is the type of conduct that the antitrust laws were designed to prohibit; it has affected interstate commerce; and it has caused or threatens to cause direct injury to Caruso's business or property. Caruso is an "efficient enforcer" of this claim because (a) there is a direct causal effect between the antitrust violation and the harm to Caruso, and the harm was intended; (b) Caruso is a direct competitor of certain members of ICSC that the anticompetitive conduct was designed to benefit; (c) the injury to Caruso is direct, and while damages may be difficult to quantify in certain instances, the fact of damages is not speculative; (d) there is no risk of duplicative recovery; and (e) there are no more direct victims.

68.     The conduct complained of herein has damaged Caruso and threatens to damage Caruso in the future in an amount that will be determined at trial. Because it will be difficult to identify all of the customer relationships that ICSC's conduct has jeopardized and determine whether they would have led to a deal, Caruso has suffered and will suffer irreparable harm in the future and is entitled to preliminary and permanent injunctive relief.

## COUNT IV
### (Tortious Interference)

69.     The averments of paragraphs 1 through 68 are repeated and realleged as if fully set forth herein.

70.     Caruso had a contract with the Wynn to conduct offsite meetings during RECon 2018. ICSC knew of that contract. ICSC intentionally caused the Wynn to breach that contract.

71.     ICSC sought to enter into a similar contract with the Wynn for the 2019 RECon. ICSC intentionally coerced the Wynn not to enter into that contract by engaging in improper and illegal conduct, including its violations of the antitrust laws.

72.     Caruso has been damaged by that conduct in an amount to be determined at trial.

73.     Because of the intentional and egregious nature of ICSC's conduct, Caruso is entitled to punitive damages.

74.     Because ICSC's conduct has caused and threatens to cause Caruso irreparable harm, Caruso is entitled to preliminary and permanent injunctive relief.

WHEREFORE, Caruso demands judgment in its favor, together with the following relief:

1.  Damages in an amount to be determined at trial.

2.  The trebling of damages under the antitrust laws.

3.  Punitive damages for tortious interference.

4.  A preliminary and permanent injunction.

5.  Costs and attorneys' fees.

6.  Such other and further relief as the Court deems just and proper.

PLAINTIFF DEMANDS TRIAL BY JURY

DATED:  December 18, 2018.

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

/s/ Steven M. Edwards

Steven M. Edwards
Email: stevenedwards@quinnemauel.com
Michael Carlinsky
michaelcarlinsky@quinnemanuel.com
Stephen Schweizer
Email: stephenschweizer@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Plaintiff Caruso Management
Company Ltd.*